THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH M. MILLER, Defendant-Appellant.

Fifth District   No. 5—90—0395

Opinion filed February 5, 1992.

Sharon S. Costa, of Costa, McHaney & Gamber, of Mt. Vernon, for appellant.

James Tomaw, State's Attorney, of Newton (Kenneth R. Boyle, Stephen E. Norris, and Diane L. Campbell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

Keith Miller was convicted by a jury of aggravated battery (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(1)) and sentenced to probation with periodic imprisonment, a fine, and restitution. Miller appeals, alleging that he was not convicted beyond a reasonable doubt and that his constitutional rights were violated during his cross-examination. We affirm.

Below is a brief recitation of the evidence presented at trial.

Jeffrey Whalin testified that he has known Keith Miller for approximately 10 years. The pair met at their place of employment and often did things together: bowling, playing guitars, playing with their remote control cars, and going to cookouts. They were good friends until the night of the occurrence. Whalin testified that on that evening he drove with Clifford Denson in Denson's van to Miller's house to retrieve his belongings. Denson stayed inside the van and arranged the items while Whalin and Miller brought the belongings to him. After removing his belongings from the Miller house, Whalin went into the kitchen and asked Miller about the $20 Miller had allegedly borrowed from Whalin a month earlier. Whalin testified that after he asked Miller for the money, "Miller reached up on the refrigerator and grabbed his wallet, flipped it open, shut it. Put it back on the refrigerator and said, 'I ain't got it.' " Whalin told Miller, "I want my money now." Whalin testified that Miller did not ordinarily keep money in his wallet. Whalin apparently knew that Miller got paid on Fridays, and since this was Saturday he knew that Miller had money. Whalin continued, "[T]hen I did something stupid. I hit him." Whalin testified that he did not have a weapon with him and that he hit Miller with his fist. Miller grabbed Whalin with his hand and pushed

his arm straight to hold him back. Whalin testified, "I swung again. I think I just grazed him that time and I thought he was swinging with the other hand, but he was evidently stabbing me." Whalin felt himself being hit in the lower chest area and glanced down to see blood flowing beneath his heart down over his abdominal area. Miller tore the button and the hook off of Whalin's overalls. Whalin pushed Miller out of the way and fled out the kitchen door.

Whalin denied choking Miller, and he also denied knocking him to the floor. Whalin testified that he never threatened to beat Miller's wife, Cynthia (Cyndy), or their four-year-old daughter, and he did not recall Cyndy Miller saying that she was going to call the police. Whalin denied that Cyndy Miller ever offered to give Whalin money from her purse. Whalin testified that he did not realize that Miller was stabbing him until he saw blood. At no time did Whalin see a knife. He testified that he is 5 feet 9 inches tall and on the date of the stabbing he weighed about 190 pounds. When asked on direct examination whether Whalin saw anything on the kitchen floor when he was at the Miller home, he answered "no." Denson drove Whalin to the hospital where he had blood transfusions and a kidney removed.

Clifford Denson testified that he and Jeff Whalin are very good friends. Denson testified that he accompanied Whalin to Miller's house to pick up a drum set and other items which Whalin had stored there. While on their way to Miller's house Whalin was calm and made no mention of any money which Miller owed him. Denson testified that when they arrived at the Miller home and requested that Miller help them load Whalin's belongings into the van, Miller and Whalin appeared to be calm. Denson went outside to arrange the items in the van while Miller and Whalin made several trips into the house to retrieve the items. While Denson was busy in the van he heard someone yell from inside the house. Denson then saw Whalin run out of the house and slam the door behind him. Whalin was holding his side when he ran up to Denson and told him that he had been stabbed and to get him out of there.

The defendant, Keith Miller, testified that Whalin came to his home to collect his personal belongings which Miller was storing for him. Among the items Whalin retrieved was a drumset in which Miller had a $16 interest. After they loaded the items into Denson's van, Whalin followed Miller into the house, started pushing Miller and told him that he wanted $20. Miller testified that Whalin told him that he wanted the money to pay for Denson's gas. Miller then asked Whalin about Miller's ownership in the drum set. Whalin called Miller a "mother ------" and told him it was his loss. Miller told Whalin to

wait until Miller could borrow the money. Miller testified that Whalin then struck him in the face with his fist, knocking him to his knees. Miller stated that his wife grabbed her purse and said, "Jeff, I've got money." Miller testified that Whalin looked at Cyndy Miller, called her a "------" bitch and said he did not want her money. Miller continued:

"He began, started pushing me around and hitting on me. And he was in the corner between the stove and the sink at that point.

\* \* \*

\*\*\* [M]y daughter had woken up and come running into the kitchen from [sic] the noise. And my wife had grabbed her and picked her up and told Mr. Whalin to please leave [and] that she was going to go call the police.

\* \* \*

Mr. Whalin had [sic] told her that she wasn't going any where. That after he was done with me, he was going to start on her and then start on that ------ kid.

\* \* \*

I ... Then I grabbed the knife out of the dish drainer.

\* \* \*

Jeff was on me like a split second after that and we wrestled around. He throwed [sic] me down on the floor a couple times. He picked me up and slammed me against our piano. At which time—point, I held the knife out in front of me the first time and said, 'Please Jeff, get out of here.' And he again come [sic] at me and started hitting me and punching me. And throwing me about the room. And he slammed me up against the refrigerator door. At that point and then [sic] he was probably two foot [sic] away from me and held the knife out in front of me again and I told Mr. Whalin, 'Jeff you better get the hell out of here.' And then he come [sic] at me again and he struck me and knocked me down to the floor."

Miller further testified that at one point Whalin was on top of him and was choking him. He recalls that Cyndy Miller struck Whalin across the back with a broom. Whalin then turned and said "you bitch you and that kid's [sic] going to pay for that." Miller testified that at that point Whalin had gone too far and so he stabbed him. Miller estimated that during the course of the fight Whalin hit him four to six times. When asked why he stabbed him, Miller testified, "Because I was in fear for my family. He had threatened them and I thought he was going to do what he had threatened to do."

With regard to his injuries, Miller testified that Whalin hit him in the eye with his fist. He stated that there were bruises on his neck from where Whalin choked him, a bruise below his left shoulder blade and scratches on his back from where he was slammed against the refrigerator.

After Whalin left, Miller went to his father-in-law's house to call the sheriff because there was no telephone at the Miller residence. Miller testified that when he returned to his own home he saw that the kitchen was "messed up." A crock and two plates were on the floor and he assumed they had fallen from the dish drainer during the scuffle. He testified that his daughter was crying and upset and was "clinging to [him] very bad." Miller estimated that the sheriff arrived at his house approximately four minutes later. Miller testified that when the officers arrived he was holding his daughter because she was still crying.

Cyndy Miller testified that when Whalin arrived at their home on January 6, he kicked at the bottom of the kitchen door, used profanity and said, "hey, let me in." She testified that Whalin also kicked a hole in the door to the storage room where his personal items were kept. After the men loaded the items into the van, Whalin followed Keith Miller back into the house and became abusive. Cyndy Miller testified that Whalin "began jabbing his finger in my husband's chest and using profanity." He told Miller, "You owe me $20." Cyndy confirmed her husband's testimony that he did not have the money at the time but that he would pay Whalin. She testified that Whalin hit her husband. Cyndy Miller grabbed her purse and tried to pay Whalin $19 but he said, "I don't want your money you ------- bitch." Mrs. Miller testified that she told Whalin to leave or she would call the police, and that Whalin responded, "Where the ---- do you think you're going? You are not going anywhere. When I'm done with him, I'm starting on you and then I'll start on that kid." She continued, "He said he would burn the house over our heads. No one would know what happened here."

She testified that she became frightened for her daughter's security so she took her to her bedroom and hid her in a closet. When she returned she saw her husband standing with a knife in his hand begging Whalin to leave. Miller testified that Whalin laughed and started beating her husband again. Keith Miller was "hit, knocked down, picked up, hit, knocked down, picked up, thrown around the room." She testified that Keith landed on the floor flat on his back. Whalin was straddling her husband. She testified that "he had one hand around my husband's throat and the other hand drawn back as if to

hit him in the face again." Cyndy Miller testified that she grabbed a broom and hit Whalin. Whalin said, "You bitch, you and that kid are going to pay for that." Cyndy Miller testified that after that her husband stabbed Whalin. Whalin came at her husband again and Keith stabbed him again. She estimated that Whalin struck her husband four or five times.

Max Bunton, deputy sheriff of Jasper County, arrived at the crime scene shortly after Miller reported the incident to the police. Bunton was the first officer to arrive at Miller's house. Bunton testified that upon entering the kitchen he observed overturned plates, some debris on the floor and a chair that someone set out away from the table area. Upon questioning Miller, Bunton learned that Cyndy and the Millers' then three-year-old daughter, Mary, were present during Miller's altercation with Whalin. Bunton testified that Miller advised him that Whalin had come to his home to retrieve a drum set that was stored there. After loading the drums into Denson's van, Miller and Whalin returned to the kitchen and began to fight over money. At one point Miller and Whalin were both on the floor. Miller then stated, "stupidly[,] I grabbed a knife and stuck him."

Bunton testified that at this point he instructed Cyndy and Keith Miller to be careful as to what they said and he advised them of their *Miranda* rights. Bunton testified that the Millers' child was in the house while he was questioning the defendant and that she was in and out of the kitchen but was quiet. Bunton recalled that the defendant's eye was swelling, but Bunton did not recall any other noticeable injuries. Miller did not complain of any physical injuries. Shortly after reading the *Miranda* warnings to the Millers, Sheriff Benefiel arrived.

Phil Benefiel, Jasper County sheriff, testified that he was called to the scene of the stabbing shortly after the incident occurred. Upon entering the defendant's home he observed some plates and a cookie jar on the kitchen floor. A kitchen chair had been pulled away from the kitchen table toward the center of the room. Sheriff Benefiel testified that the defendant explained that he had been sleeping on the couch when he was awakened by Jeffrey Whalin, who had come to pick up some of his possessions. Miller assisted Whalin in carrying the items out to Denson's van, and Whalin asked Miller for $20 which he said Miller owed him. The men reentered the house and began arguing over their right to possession of the drum set. Miller told Sheriff Benefiel that at that point Whalin struck Miller in the eye with his fist. The two men wrestled in the kitchen, and Miller retrieved a bayonet from the dish drainer. Benefiel testified that Miller then stated

that he freaked out and stabbed Whalin in the arm. He pushed Whalin away, but when Whalin came back at him Miller stabbed him in the chest.

Benefiel testified that he observed the defendant's daughter in the living room, but there was nothing noticeable about her. Benefiel testified that if they had not introduced her to him, he would not have known she was there. Benefiel testified that while at Miller's home that evening he noticed that there was swelling between Miller's left eye and the cheekbone area. Miller is approximately 5 feet 8 inches tall and weighed 160 pounds on the night of the incident.

Dr. Steven Szigethy testified that on January 9, 1990, he examined Keith Miller. Szigethy testified that he found "some scratch marks, abrasions and hematoma." Under Miller's left eye Szigethy observed what he termed a resolving hematoma, where the skin was greenish and yellowish in color. Szigethy testified that he also observed scratch marks on Keith Miller's back, and scraped skin to the left of Miller's shoulder blade and on his neck. Of the abrasions on the back and neck, Szigethy testified that of his own personal knowledge he did not know how they got there and could not say whether or not they were there before or after January 6, 1990.

■ Keith Miller argues that he was not proved guilty beyond a reasonable doubt. He contends that there are two conflicting versions of the altercation which took place between himself and Whalin and that the record does not support the determination of the trier of fact. Specifically Miller points out that the jury was instructed on his assertion of self-defense. He argues that it is clear that he was not the aggressor as he had bruises on his face, neck and body; he feared for his own safety and that of his family. Miller argues that the State failed to prove that the force used by him was not justified and that Whalin's testimony is so improbable on this point that his conviction must be reversed.

> "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *** When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime be-

yond a reasonable doubt.' " (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77.)

Here the jury's determination depended upon the credibility of the witnesses and the weight given their testimony. It is the jury's responsibility to resolve any factual disputes, to assess the credibility of the witnesses, and to determine the sufficiency of the evidence for a verdict of guilt. (*People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341; *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402.) Based on the record we find no reason to substitute our judgment for that of the jury.

Miller next argues that he was denied a fair trial because of the State's repeated references to his post-arrest silence.

During cross-examination of the defendant, the prosecutor attempted to question him regarding his conversations with the arresting officers and his failure to tell the arresting officers certain things. The colloquy between the prosecutor and the defendant is as follows:

"Q. You remember the ride to the jail in the car?

A. Yes.

Q. And when you were talking to Deputy Bunton and Sheriff Benefiel, you knew they needed to know everything at that time, didn't you?

A. Yes.

Q. In fact, you knew they would be relying on what you told him [*sic*] to make some decision?"

The defense attorney objected to this line of questioning. The trial court sustained the objection and admonished the jury to draw no inference from the failure, if any, of the defendant to make any statement.

Later during the State's cross-examination, defense counsel posed an objection on similar grounds after the State's Attorney asked, "Mr. Miller, when you were checked into the County Jail that evening, the jailer asked you about your—whether or not you had any injuries, didn't he?" Once again the trial court admonished the jury, "the State may not inquire and jury may draw no inference from this individual's [*sic*] not making any statements."

Finally, during the State's closing argument the court sustained the defendant's third objection to the State's reference to the defendant's post-arrest silence. Specifically, the court sustained an objection to the State referring to Miller's failure to make certain statements to the arresting officers.

Miller argues that a defendant's right to remain silent may not be commented upon by the prosecutor and that in this case the State

was engaged in a deliberate course of conduct so as to bring the situation out of the realm of harmless error. We disagree.

■ The *Miranda* warnings, which were read to the defendant upon his arrest, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The Supreme Court has held that a prosecutor may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examination of the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest; use of the defendant's post-arrest silence in such manner violates due process. *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.

■ Unlike the defendant in *Doyle*, "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.) Here, the defendant made statements to the police after receiving the *Miranda* warnings. As to the subject matter of his statements, Miller had not remained silent at all. (See *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180.) Because Miller took the stand to testify in his own defense, the State could properly attempt to impeach his testimony. (*People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39.) The State points out that there were a number of inconsistencies in Miller's statement to the arresting officers and his testimony in court, for example: (1) Miller's failure to inform the police of Whalin's alleged threats to his wife and child; (2) Miller's failure to report Whalin's threat to burn the house down; and (3) Miller's failure to report any injury other than his eye.

Viewing the prosecutor's comments, we cannot conclude that the references to Miller's failure to mention these matters were impermissible. The State's reference to them was not improper.

Based on the foregoing, we affirm the defendant's conviction.

Affirmed.

GOLDENHERSH, P.J., and RARICK, J., concur.