THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES HUDDLESTON, Defendant-Appellant.

First District (2nd Division) No. 1—91—2095

Opinion filed March 16, 1993.

Rita A. Fry, Public Defender, of Chicago (Lynne Hubanks Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Cory J. Pollack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

At approximately 3 a.m. on June 1, 1990, Joyce Ash saw a yellow Lincoln Continental with two occupants proceed down 16th Street in the City of Chicago and park across the street about 90 feet from her front porch where she and her brother, Patrick Williams, were sitting. After the car stopped, Ash observed the passenger exit the car and cross the street while the driver, whom she identified as the victim, Donald Taylor, walked empty-handed around the car and stood on the sidewalk next to the passenger side. A few seconds later, she noticed that a third person, whom she identified as defendant, had joined Taylor on the sidewalk near the passenger side of the automobile. She then saw that although Taylor did not make any motion toward defendant, defendant made a jabbing motion with his arm toward Taylor's chest. Ash then saw Taylor jump backwards, stumble into the street, and collapse. As she observed defendant follow Taylor into the street, Ash noticed that defendant had a knife in his hand which he then placed in his back pocket.

Ash then ran into the street with Williams to help Taylor, who, by the time they arrived, had been carried back onto the sidewalk. She noticed that Taylor's chest was full of blood, and she heard someone tell the defendant, who was standing behind her, "Man, I think you done killed him. You better get away from here." She then watched as defendant fled from the scene. Later that morning, Ash picked defendant out of a lineup as Taylor's assailant and also identified the knife that he used and the gloves that he was wearing on the night of the homicide.

Williams also testified and gave substantially the same account as Ash had related, except that he did not see the yellow Lincoln pull up to the curb because he was looking the other way at the time. He did witness, however, that defendant had a knife in his hand before he saw him make a thrusting motion toward Taylor, and he corroborated Ash's testimony that Taylor did not make any gesture or motion toward defendant before he was stabbed.

Williams further stated that when he accompanied Ash to assist Taylor after he had collapsed, he followed defendant, who had begun to walk away from the scene, and saw him hurl the knife toward the roof of a garage and observed it fall to the ground. Finally, Williams, who had earlier called the police to report the incident, flagged down a squad car and informed the officers that he had witnessed defendant stab Taylor.

Ruben Kelly also testified for the State and related the following events. At about 3 a.m. on June 1, 1990, he was drinking beer with some friends outside of a fast-food restaurant across the street from where the incident took place. At that time, a yellow car driven by Taylor and carrying another man in the passenger seat parked directly across the street from the restaurant. The passenger alighted and went across the street into a tavern.

A short time later, Kelly saw a man whom he recognized as defendant approach the driver's side of the vehicle, and soon thereafter, he observed defendant and Taylor walk to the passenger side of the automobile. About a minute later, Kelly saw defendant, armed with a knife, make one or two stabbing motions toward Taylor's midsection; he did not see Taylor attack defendant, nor did he ever see anything in Taylor's hands. Kelly then observed Taylor stagger into the street and fall on his face.

As Kelly approached Taylor while he was being carried back onto the sidewalk, he noticed that defendant's shirt was full of blood. At that time, he told defendant, whom he had earlier seen place the knife in his back pocket, to "get out of here *** because

the guy looked like he [was] dead." He then watched defendant flee from the scene.

Kelly identified at trial the knife he saw the night of the incident. He also testified that between 30 minutes to one hour before the occurrence, he saw defendant a few blocks from the scene with that same knife protruding from his back pocket, and he told defendant to get rid of it before he "got busted."

Chicago police officer Richard Nelson testified that he responded to a call of a battery in progress at about 3:18 a.m. on June 1, 1990. He arrived at the scene soon thereafter and spoke with Williams, who told him that he had witnessed a stabbing, and described the offender, who by that time had fled. Officer Nelson observed a few blocks away the man described by Williams, later identified as defendant, and saw that he was throwing an object, later identified as the knife used in the homicide. Officer Nelson pursued, apprehended and ultimately arrested defendant.

Chicago police officer James Tolliver testified that he was assigned as an evidence technician in this case and that at approximately 3:30 a.m. on June 1, 1990, he recovered a knife and a pair of black gloves from the scene of the crime. He inventoried the evidence and identified it at trial.

Finally, the State offered via stipulation that if Michael Chambliss were called to testify, he would have stated that: (1) he was a Cook County medical examiner; (2) Taylor died as result of a single stab wound to the chest; and (3) Taylor's toxicology report revealed that his blood contained amounts of ethanol, cocaine and phencyclidine.

Defendant presented the following evidence. Ricky Haley testified that at approximately 9 p.m. on May 31, 1990, Taylor came by his home and told him that defendant was "messing with him." Haley stated that he walked with Taylor to the corner of Ogden and Kedzie Avenues, located a few blocks from the scene of the crime, in order to protect him in the event that he was attacked by defendant. A short time later, after nothing had occurred, Haley returned home. He also related that Taylor was not carrying any weapons during the period of time Haley accompanied him.

Chicago police detective Greg Bronsberg testified briefly to the fact that Kelly, one of the State's witnesses, had been drinking the evening of the incident; Bronsberg added, however, that Kelly was not so drunk that he was unable to describe what he had seen that night.

Finally, defendant took the stand and offered the following version of the events on the night of the homicide. At about 10:30 p.m. on May 31, 1990, he saw Taylor on the corner of Ogden and Kedzie, at which time, defendant, Taylor, Haley and a man named L.C. Johnson were standing together on the street. Taylor demanded that Johnson repay some money which Johnson owed him, but because Johnson did not have any money, defendant gave Taylor the $8. Defendant then asked Johnson when he would be able to repay the money, and Johnson told him that he did not know when he would be able to do so. For that reason, defendant requested that Taylor return his $8. When Taylor refused, an argument ensued; eventually, however, cooler heads prevailed, and Taylor returned the money without any incident.[1]

About 2:30 or 3 the next morning, defendant was talking with some friends on 16th Street when he observed Taylor drive up and park his car near him. After Taylor's passenger alighted from the car and walked across the street, Taylor exited the car and approached him with a pipe or a tire iron. Taylor told him that "he would fuck [him] up if [defendant] ever did something like that again," and swung the object at defendant; he missed, however, and defendant pushed Taylor back into the open passenger door. One of the persons with whom he had been talking before Taylor's arrival then handed him a knife, and while Taylor was still "wedged" inside the car door, defendant stabbed him once in the chest. Defendant stated that Taylor did not have the weapon in his hands when he stabbed him, explaining that he must have dropped it when he tried unsuccessfully to hit him. Defendant denied that he had possession of the knife earlier in the evening or that he had earlier spoken to Kelly about it. After stabbing Taylor, defendant placed the knife in his back pocket and walked away from the scene. When he saw police officers approaching him, he threw the knife away.

In rebuttal, the State introduced certified copies of two of defendant's prior convictions, one of which was for attempt (robbery) and the other was for residential burglary.

The trial judge found defendant guilty of first-degree murder. Defendant waived his right to a jury at the death penalty hearing, and after the parties stipulated that he was eligible for the death penalty, the trial judge found that certain mitigating factors pre-

---

[1]Defendant contradicted himself during cross-examination, however, when he stated that he was actually arguing with Johnson, not Taylor, over the return of the $8.

cluded him from imposing it. Accordingly, defendant was sentenced to a term of natural life in the custody of the Illinois Department of Corrections.

I

Defendant asserts that he sustained his burden of establishing that he acted reasonably in defense of his person against the attack by Taylor. Section 7—1 of the Criminal Code states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1989, ch. 38, par. 7—1.

■■ Under section 7—1, each of the following elements must be present in order for a defendant to prevail on a self-defense claim: (1) that force had been threatened against the defendant; (2) that defendant was not the aggressor; (3) that the danger of harm to the defendant was imminent; (4) that the force threatened to the defendant was unlawful; (5) that the defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force used by the defendant was necessary; and (6) that all of the defendant's beliefs were reasonable. (*People v. Willis* (1991), 217 Ill. App. 3d 909, 917, 577 N.E.2d 1215, 1220, *appeal denied* (1991), 142 Ill. 2d 664, 584 N.E.2d 1139; *People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499, 501.) When a defendant raises the issue of self-defense and introduces some evidence as to each of these elements, the burden then shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. (*People v. Murillo* (1992), 225 Ill. App. 3d 286, 292, 587 N.E.2d 1199, 1204, *appeal denied* (1992), 145 Ill. 2d 641, 596 N.E.2d 634; *Willis*, 217 Ill. App. 3d at 917-18, 577 N.E.2d at 1220.) If the State negates beyond a reasonable doubt any one of the above-mentioned elements, it has met its burden and the defense must be rejected. *Murillo*, 225 Ill. App. 3d at 292, 587 N.E.2d at 1204.

Whether a killing is justified under the law of self-defense is a question of fact (*People v. Felella* (1989), 131 Ill. 2d 525, 533, 546 N.E.2d 492, 495; *Willis*, 217 Ill. App. 3d at 918, 577 N.E.2d at

1220; *People v. Miller* (1991), 211 Ill. App. 3d 572, 579, 570 N.E.2d 515, 519), and the fact finder is not required to accept as true the defendant's evidence in support of that defense (*Murillo*, 225 Ill. App. 3d at 292, 587 N.E.2d at 1204; *Miller*, 211 Ill. App. 3d at 579, 570 N.E.2d at 519). Instead, the trier of fact is obliged to consider the probability or improbability of the evidence, the circumstances surrounding the event, and all of the witnesses' testimony. (*Murillo*, 225 Ill. App. 3d at 292, 587 N.E.2d at 1204; *Miller*, 211 Ill. App. 3d at 579, 570 N.E.2d at 519.) The standard of review which this court must apply to a fact finder's determination of a defendant's guilt or innocence, as recently defined by our supreme court, is whether

> "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. [Citations.] This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' [Citation.] Therefore, [a reviewing] court will not reverse a criminal conviction unless the evidence is so 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation].' [Citation.]" *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

In the case at bar, it is clear that defendant has raised the issue of self-defense and has offered "some evidence" as to each element of that defense. He testified that Taylor exited the car, approached him menacingly, told him that he would "fuck [him] up," and then swung a pipe or tire iron at him. Accordingly, we find that defendant's testimony was enough to satisfy the "some evidence" standard as to all of the elements of his self-defense claim.

We find it equally clear, however, that the State has sufficiently rebutted defendant's self-defense claim by proving beyond a reasonable doubt the nonexistence of at least one of the elements of that defense. All three eyewitnesses to the incident stated that Taylor had nothing in his hand at any time during the incident and that he made no move whatsoever toward defendant before he was stabbed. Consequently, it was incontestably reasonable for the trial court to conclude that defendant was not in danger of immediate death or great bodily harm when he stabbed Taylor; certainly, we cannot say

that its determination was "so unreasonable, improbable, or unsatis-factory" as to warrant a reversal of defendant's conviction.

## II

Defendant next contends that even if we do not find that he acted reasonably in self-defense, we should at least reduce his conviction to second-degree murder for the reason that he acted unreasonably in killing Taylor in self-defense. Section 9—2 of the Criminal Code provides in pertinent part:

> "Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code [Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2)] and either of the following mitigating factors are present:
>
> \* \* \*
>
> (2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Ill. Rev. Stat. 1989, ch. 38, par. 7—1 *et seq.*], but his belief is unreasonable.
>
> \* \* \*
>
> (c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." Ill. Rev. Stat. 1989, ch. 38, par. 9—2.

■■ Under section 9—2, once the State has proved the elements of first-degree murder beyond a reasonable doubt, the offense of first-degree murder will be reduced to second-degree murder if the defendant can establish by the preponderance of the evidence that he acted unreasonably in self-defense. (*People v. Shumpert* (1989), 126 Ill. 2d 344, 352, 533 N.E.2d 1106, 1109; *People v. Woodrome* (1992), 237 Ill. App. 3d 220, 237, 604 N.E.2d 486, 498; *Willis*, 217 Ill. App. 3d at 924-25, 577 N.E.2d at 1225.) It is not incumbent on

the State, in establishing the elements of first-degree murder, to prove the nonexistence of the mitigating factors, here the "imperfect self-defense," present in section 9—2. (*Shumpert*, 126 Ill. 2d at 352, 533 N.E.2d at 1109; *Woodrome*, 237 Ill. App. 3d at 237, 604 N.E.2d at 498; *Willis*, 217 Ill. App. 3d at 925, 577 N.E.2d at 1225.) Furthermore, if the defendant does prove that he acted unreasonably in self-defense, that will not negate the requisite *mens rea* for first-degree murder. (*Willis*, 217 Ill. App. 3d at 925, 577 N.E.2d at 1225; *People v. Jerome* (1990), 206 Ill. App. 3d 428, 436, 564 N.E.2d 221, 226, *appeal denied* (1991), 137 Ill. 2d 668, 571 N.E.2d 152.) Finally, courts in Illinois have invariably held that it is for the trier of fact to determine whether a homicide is murder or manslaughter, or whether it is justified as self-defense. (See, *e.g., People v. Davis* (1966), 35 Ill. 2d 55, 61, 219 N.E.2d 468, 471; *People v. Berryman* (1988), 171 Ill. App. 3d 548, 555, 526 N.E.2d 180, 184, *appeal denied* (1988), 123 Ill. 2d 560, 535 N.E.2d 404.) Since, under our present statutory scheme, what used to be considered murder is currently defined as first-degree murder, and what was once classified as voluntary manslaughter is now defined as second-degree murder[2] (see *People v. Newbern* (1991), 219 Ill. App. 3d 333, 343, 579 N.E.2d 583, 589-90, *appeal denied* (1992), 143 Ill. 2d 645, 587 N.E.2d 1022), it necessarily follows that it is for the fact finder to decide whether a homicide is first- or second-degree murder.

■ In the case at bar, we find that the trial court's determination that defendant was guilty of first-degree murder was not so unreasonable as to require a reduction of the offense to second-degree murder. The court obviously rejected defendant's story and accepted the eyewitnesses' account of the events which clearly illustrated that Taylor did not at all provoke defendant. Because we are not entitled to reweigh the conflicting evidence, but instead must view it in the light most favorable to the State, we affirm the trial court's determination that defendant failed to prove by a preponderance of the evidence that he acted unreasonably, in self-defense.

### III

In his final assignment of error, defendant claims that he should be granted a new trial because the trial judge should not have al-

---

[2]We note in this regard that defendant erroneously asks us to reduce his conviction to voluntary manslaughter instead of second-degree murder.

lowed the prosecutor to cross-examine him with respect to his post-arrest silence. The cross-examination at issue was as follows:

"[State's Attorney:] Sir, do you remember talking to an assistant state's attorney by the name of Marjorie Laws and Detective Bronsberg who just testified here?

[Defendant:] Yes, I do.

[State's Attorney:] And, in fact, sir, that was after you were arrested at about 7:45 in the morning on June 1, 1990, correct?

[Defendant:] Yes.

[State's Attorney:] And that conversation took place at Area Four, right at Harrison and Kedzie, correct?

[Defendant:] Correct.

[State's Attorney:] And at that time, sir, they advised you of your rights; is that right?

[Defendant:] Yes.

[State's Attorney:] You told them you understood those rights?

[Defendant:] Yes.

[State's Attorney:] And at that time, sir, you never told them that [Taylor] came at you with a pipe, did you, sir?

[Defense Counsel:] Object, judge.

[THE COURT:] Basis?

[Defense Counsel:] He has no duty to speak to the state's attorney at all, judge. What I believe he said was: I don't know. I wasn't involved. That's the statement.

[THE COURT:] Overruled.

[State's Attorney:] Did you tell the detective and the state's attorney that Mr. Taylor came at you with a pipe?

[Defendant:] No, I didn't.

[State's Attorney:] In fact, sir, you denied any knowledge of the incident; isn't that right?

[Defendant:] Yes, I did.

[State's Attorney:] And you told them, sir, you were at your mother's house from 8:00 p.m. to 2:30 in the morning; isn't that right?

[Defense Counsel:] Object, judge. It's not impeaching.

[State's Attorney:] Judge, I certainly think it is.

[THE COURT:] Overruled.

[Defense Counsel:] Judge, it's not impeaching. It's collateral to this. It's irrelevant. The issue is 3:00 o'clock in the

morning. He doesn't impeach anything that he said he was at his mother's house which happens to be on the same block.

[THE COURT:] Overruled.

[State's Attorney:] Sir, did you tell them that, that you had been at your mother's house from 8:00 p.m. to 2:30 in the morning?

[Defendant:] I may have said I was there but I don't remember telling him it was that time.

[State's Attorney:] But you did tell them that you had been at your mother's house that morning, correct?

[Defendant:] Yes.

[State's Attorney:] And you also told them that you had forgotten something at your mother's house, a speaker, and you went back to pick it up; isn't that correct?

[Defendant:] Yes.

[State's Attorney:] And you told the state's attorney and the detective that you were arrested on the way back to your mother's house; is that correct?

[Defendant:] Yes.

[State's Attorney:] You never told the police and you never told the state's attorney anything about Donald Taylor coming after you, did you, sir?

[Defendant:] No, I didn't."

Defendant argues that this cross-examination impeached him regarding his post-arrest silence and thus violated his right to remain silent after arrest despite the guarantee to the contrary in a *Miranda* warning, as espoused in *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. We find, however, that the case *sub judice* is governed by *Anderson v. Charles* (1980), 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, where the United States Supreme Court explained:

> "In *Doyle*, we held that the Due Process Clause of the Fourteenth Amendment prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. The case involved two defendants who made no postarrest [*sic*] statements about their involvement in the crime. Each testified at trial that they had been framed. On cross-examination, the prosecutor asked the defendants why they had not told the frameup [*sic*] story to the police upon arrest. We concluded that such an impeachment was fundamentally unfair because *Miranda* warnings inform a person of his right to re-

main silent and assure him, at least implicitly, that his silence will not be used against him. [Citations.]

Doyle bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. *But Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.* [Citations.]" (Emphasis added.) *Anderson,* 447 U.S. at 407-08, 65 L. Ed. 2d at 226, 100 S. Ct. at 2181-82.

Accord *People v. Frieberg* (1992), 147 Ill. 2d 326, 355-56, 589 N.E.2d 508, 520-21; *People v. Rehbein* (1978), 74 Ill. 2d 435, 440-43, 386 N.E.2d 39, 41-42; *People v. Miller* (1992), 224 Ill. App. 3d 823, 831, 587 N.E.2d 1136, 1141.

■ In this case, it is clear that the prosecutor's cross-examination was proper because it impeached defendant with his post-arrest statements. After his arrest, defendant told the police that he had nothing to do with Taylor's death, that he had been at his mother's house from 8 p.m. to 2:30 a.m, and that he was arrested while returning there to retrieve a speaker which he had forgotten. His story, however, was belied by his testimony at trial wherein he stated that he killed Taylor in self-defense and that he had a previous meeting with him and others at 10:30 p.m. Accordingly, the prosecutor's cross-examination of defendant was proper impeachment under *Anderson* for the reason that the questioning "ma[de] no unfair use of [his] silence *** [because] defendant ha[d] not remained silent at all" (*Anderson,* 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182); and as former Chief Justice Burger stated, "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New York* (1971), 401 U.S. 222, 226, 28 L. Ed. 2d 1, 5, 91 S. Ct. 643, 646.

Defendant nevertheless urges that this court's recent decision in *People v. Gagliani* (1991), 210 Ill. App. 3d 617, 569 N.E.2d 534, requires that we reverse and grant him a new trial. We disagree. In *Gagliani,* the defendant told a police officer after being arrested and "Mirandized" that he "didn't have anything to do with the incident" and that he "did not know what [the officer] was talking about" when questioned about a sexual assault. (*Gagliani,* 210 Ill. App. 3d at 621, 569 N.E.2d at 537.) After defendant testified at

trial that he engaged in consensual intercourse with the victim, the prosecutor impeached him with his prior inconsistent statement to the police. (*Gagliani*, 210 Ill. App. 3d at 625, 569 N.E.2d at 539.) The appellate court held this cross-examination to be reversible error since it in effect was an impeachment with post-arrest silence prohibited by *Doyle. Gagliani*, 210 Ill. App. 3d at 624-25, 569 N.E.2d at 540-41.

In *People v. Frieberg* (1992), 147 Ill. 2d 326, 589 N.E.2d 508, however, the defendant was arrested for various violations of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1991, ch. 56½, par. 1101 *et seq.*). (*Frieberg*, 147 Ill. 2d at 336, 589 N.E.2d at 513.) After being given his *Miranda* warnings, he related a version of the events prior to the purchase of cocaine found in his home which was inconsistent with his trial testimony, and the assistant State's Attorney impeached him on cross-examination regarding his divergent stories. (*Frieberg*, 147 Ill. 2d at 355-56, 589 N.E.2d at 521.) Our supreme court rejected the defendant's contention that a *Doyle* violation similar to the one in *Gagliani* had occurred, explaining thus:

> "Following his arrest and *Miranda* warnings, defendant did not remain silent. He related an entire version of events, but denied his knowledge of the cocaine and the anticipated drug deal. Defendant also omitted significant details to which he later testified at trial. This initial version was thus inconsistent with defendant's subsequent trial testimony and his theory of defense. Under *Anderson* and *Rehbein*, the State could properly cross-examine defendant regarding his prior inconsistent statements made following arrest.
>
> \*\*\* [W]e find [*Gagliani*], also cited by defendant, to be distinguishable from the present case. *Gagliani did not concern a situation where a defendant gave authorities any version of events which later proved inconsistent; the defendant simply denied knowledge of the incident.* As such, the factual situation, as the appellate court recognized in *Gagliani*, was akin to that of *Doyle*." (Emphasis added.) *Frieberg*, 147 Ill. 2d at 356, 589 N.E.2d at 522.

We find the case at bar to be on all fours with *Frieberg* and inapposite to *Gagliani*. Defendant here did not merely deny knowledge of the incident; instead, he told police officers that he was at his mother's house all evening and that he was arrested while returning home to pick up a speaker which he had left there. As stated above, this contradicted his trial testimony that he was at

other places on the night of the offense and that he was conversing with a group of friends outside on the street when he was attacked by Taylor. Accordingly, *Gagliani* is inapplicable, and the prosecutor's cross-examination was proper under *Anderson*.

For all of the foregoing reasons, we affirm defendant's conviction for first-degree murder.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.