2021 IL App (1st) 192013-U

No. 1-19-2013

Order filed November 3, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 16677 |
| | ) | |
| EDDIE CROWDER, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's conviction for first degree murder under a theory of transferred intent where he did not establish that he had a subjective belief that he was acting in self-defense.

¶ 2     Following a jury trial, defendant Eddie Crowder was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)) under the theory of transferred intent, and sentenced to 20 years' imprisonment and 30

months' probation, respectively.[1] On appeal, defendant contends this court should reduce his conviction to second degree murder because no reasonable jury could have concluded that he did not subjectively believe he was acting in self-defense. We affirm.

¶ 3    Defendant was charged by indictment with multiple offenses arising from the October 21, 2017, stabbings of Elizabeth Kennedy and Jonathan Williams, which resulted in Kennedy's death. The State proceeded on two counts of first degree murder and one count of aggravated battery. Defendant's answer to discovery raised the affirmative defense of self-defense.

¶ 4    At trial, Jonathan testified that he was married to, and had children with, Dominique Catledge.[2] Jonathan admitted that at the time of trial, he had a pending domestic battery case, as well as two prior cases involving Catledge from 2008 and 2017. Jonathan also had two children with Kennedy—Jennifer and Jonathan Jr. Jonathan testified that Kennedy and defendant were in a relationship at the time of the incident, and had a baby together. Jonathan had known defendant as a close family friend since childhood, and his children considered defendant to be an uncle. Jonathan testified that he did not have any issue with defendant having a child with Kennedy, but his son, Jonathan Jr., had previously confronted defendant about it.

¶ 5    On October 21, 2017, at approximately 5 p.m., Jonathan traveled with Catledge and their children to his father James's house to pick up Jennifer. James was not home, so they waited on the porch. Jonathan then saw Kennedy drop Jennifer off behind the house, and she joined them.

---

[1] The trial court stated that the term of probation for aggravated battery "terminated *instanter*." The mittimus only reflects defendant's first degree murder conviction.

[2] As several individuals mentioned in this order share last names, we will refer to those individuals by their first names.

Jonathan testified that he wanted to speak with defendant to "address the issue" so that his son would no longer have "clashes" with defendant.

¶ 6     Approximately 30 minutes after Kennedy arrived, James and defendant arrived in defendant's vehicle. Jonathan believed that James and defendant had been drinking. He described James as "a little wobbly." Defendant was also not "sober," and walked up with a beer in his hand. Jonathan shook defendant's hand and "calmly" asked him to speak with him. Defendant agreed. Jonathan told defendant that he knew defendant would "be around" because he was a friend of the family and had a child with Kennedy, so there was "no need" for them to fight. Jonathan informed defendant he wanted them to "come to a compromise." Jonathan testified that defendant became belligerent and said that he "didn't want to hear this s***." Kennedy then approached the pair, came between them, and said, "we're not going to do this right now." Jonathan told her that he did not intend to fight.

¶ 7     As Jonathan was speaking with Kennedy, defendant took "a cheap shot" by swinging his fist at him. Defendant missed, but bumped James and knocked him to the ground. As Jonathan moved to help James up, Jonathan observed that defendant was holding an unopened pocketknife. Jonathan knew that defendant carried a knife, and had observed defendant with knives before.

¶ 8     Defendant swung the knife at Jonathan, who swung back with his fists "in self-defense" and hit defendant on the right side of his face. Defendant then opened the knife, and Kennedy stepped forward to stop him while Jonathan stepped backward. Defendant swung the open knife once, missing Jonathan. Jonathan testified that defendant "touched" Kennedy with the knife, but Jonathan could not determine whether Kennedy had been stabbed.

¶ 9     Defendant then "came at" Jonathan with the open knife, and Jonathan threw his left hand over his face for protection. Defendant cut Jonathan's arm, and then sliced again, hitting the side of his face. Defendant continued to attack Jonathan with the knife, scratching his neck with less force than before. Jonathan attempted to flee toward James's house, and defendant stabbed him in the back twice. Jonathan then ran to the gangway and grabbed a piece of fence to defend himself as defendant pursued. Jonathan heard screaming from the front sidewalk, but could not see what was happening. Jonathan saw defendant look toward the sidewalk, then fold the knife, and walk off.

¶ 10     At that point, Jonathan returned to the sidewalk and observed Kennedy on the ground in a puddle of blood. Jonathan identified photographs of the scene and marked the location of the fight, James's house, and the fence, as well as the slat of fencing that he used, which were admitted into evidence. Jonathan also identified photographs of his injuries, which were also admitted into evidence.

¶ 11     On cross-examination, Jonathan testified that his pending domestic battery case involved a different woman with whom he also had a child. Jonathan also explained that the incident between defendant and Jonathan Jr. had occurred approximately a month before the offense, just after Jonathan Jr. turned 16 years old. During that incident, Jonathan Jr. vandalized defendant's vehicle and asked defendant to leave, and Jonathan believed that defendant had "put his hands on" Jonathan Jr. Jonathan testified that he later learned that defendant and Jonathan Jr. had "patched things up" earlier on the day of offense, but defendant did not mention it at the time. Jonathan denied that he was angry about the earlier incident, reiterating that he did not want to "have a confrontation" with defendant, but rather desired to discuss the situation and come to a

compromise. Jonathan further testified that he had not had "any words" with defendant about Kennedy's pregnancy, and that Jonathan was not bothered by it.

¶ 12    James testified that he and defendant were friends, and that they had known each other for approximately 11 years. On October 21, 2017, he was drinking alcohol with defendant before defendant drove him home. James testified that he was intoxicated, but not "out of it." There had previously been an "issue" between defendant and Jonathan Jr., but they had since "made peace." Defendant, however, did not want to enter the house because Jonathan did not know that he and Jonathan Jr. had "ironed out th[eir] differences," and Jonathan would have been upset to see him.

¶ 13    At some point, James saw Jonathan approach defendant and tell him that he "didn't think it would be wise for him to be there" because Jonathan Jr. would arrive soon. As Jonathan and defendant argued, Kennedy became upset and attempted to stop them. James believed that he tripped and fell on an uneven sidewalk, and did not know what occurred next. He did not see anything happen to Kennedy. James identified photographs of the sidewalk covered in Kennedy's blood, himself and Kennedy on the ground, and his injury.

¶ 14    Catledge testified that she was married to Jonathan, and that they had been together for 14 years. Catledge admitted that she filed police reports against Jonathan in 2007 and 2008 in which she alleged he had been physically violent with her. At the time of trial, Catledge had four biological children with Jonathan, including Jaythan and Jabarri. Catledge had a "[p]retty good" relationship with Kennedy. Catledge explained that defendant and Kennedy had been in a relationship for around four years, although they first informed the family about their relationship approximately 11 months prior to the offense, when Kennedy discovered she was pregnant.

¶ 15    Catledge testified consistently with Jonathan regarding defendant's arrival at James's house. Catledge observed Jonathan approach defendant to speak with him, and then heard defendant say in an angry tone of voice that he "wasn't trying to hear the s***" that Jonathan was saying. Catledge then saw defendant "thr[o]w a punch." Catledge and Kennedy were between the men when this happened, and Jennifer was also nearby. Catledge tried to move Kennedy and Jennifer out of the way. Catledge observed that James had been pushed to the ground, and Jonathan tried to help him. At that point, Catledge observed that Jonathan's arm was cut. Jonathan then said that "he stuck her," and ran toward James's house.

¶ 16    Catledge held Kennedy, but let her go so that Catledge could run after the men. Kennedy then fell on the concrete and shattered her teeth. Jennifer began screaming that her mother was bleeding. Catledge saw defendant walk toward the house, holding a black knife which he closed and placed on his belt. Catledge also observed that there was a cut on Jonathan's arm. Defendant began to walk toward his vehicle, and started to run once he became closer to Kennedy. Kennedy was pronounced dead when the ambulance arrived. Catledge further testified that she knew that defendant carried a knife, and that he had it whenever she saw him.

¶ 17    On cross-examination, Catledge testified that she had seen Jonathan upset many times before, and he was not upset on the day of the incident. Catledge did not see Kennedy or Jonathan being stabbed. She did not remember seeing either Jonathan or defendant land a punch on each other.

¶ 18    Jennifer testified that she was 15 years old at the time of trial, and that Jonathan is her father. On October 21, 2017, Jennifer's mother, Kennedy, drove her to James's house. Jennifer was sitting in the passenger's seat of Kennedy's car with the door open when defendant and James

arrived. Jonathan walked to defendant to speak with him, and during their conversation they became louder and defendant swung at Jonathan. When trying to break up the fight, Jennifer, Kennedy, and James fell to the ground. After standing, Jennifer observed blood coming from Kennedy's chest and covering her shirt. Defendant and Jonathan were still fighting, and defendant began chasing Jonathan with an open knife.

¶ 19     Catledge then held Kennedy, who fell forward onto the ground. Jennifer screamed and stayed with Kennedy until Jonathan returned and laid on the ground with them. Defendant went to his car, and Jennifer ran to a friend's house for help. On cross-examination, Jennifer testified that she was a few houses away when Kennedy was stabbed.

¶ 20     Jabarri testified that he was 12 years old at the time of trial. Catledge is his mother and Jonathan is his father. Jabarri testified consistently with Jonathan regarding everyone's arrival at James's house. Jabarri testified that defendant was holding a beer bottle when he approached and identified photographs of the bottle in court. Jabarri heard Jonathan ask to speak with defendant about a prior "situation" between defendant and Jonathan Jr., and defendant said that he did not want to talk. Jabarri was 5 to 10 feet away when defendant then started "pushing" Jonathan. Jabarri testified that Kennedy said that they should not be "do[ing] this right now," and moved to break up the fight. Jabarri observed defendant pull a knife from his right back pocket and begin swinging it toward Jonathan. Defendant cut Jonathan's arm and they moved toward the house, where Jonathan picked up a piece of a picket fence and threw it at defendant. Jabarri then saw defendant stab Kennedy, who was between defendant and Jonathan, although Jabarri did not believe that defendant stabbed her "on purpose." Jabarri then testified that he then saw Catledge holding Kennedy, and when Catledge let go, Kennedy fell to the ground hitting her jaw on the concrete. A

lot of blood emerged from her chest and mouth, and her "teeth started to fall out." Jabarri saw defendant walk away, get into his car, and drive off. Jonathan returned and tried to stop Kennedy's bleeding. Jabarri then ran to a nearby school where he asked two people to call the police.

¶ 21 On cross-examination, Jabarri admitted that he had discussed the incident with his family before testifying.

¶ 22 Jaythan testified that he was 12 years old at the time of trial. Jaythan saw Jonathan try to speak to defendant, but defendant "was not feeling it" and walked away. Defendant became angry and pushed Jonathan, who pushed him back. They fought, and defendant drew a knife, swinging it at Jonathan multiple times and cutting his arm. Kennedy was between the men, telling them not to fight. Defendant switched the knife from one hand to another between swings. Defendant swung the knife at Jonathan but hit Kennedy in her upper chest. Kennedy fell to the ground and began bleeding out "very fast." Jaythan testified that he saw "[l]iquor" in defendant's hands before the fight.

¶ 23 Dr. Khanh Huynh, an emergency room physician at Holy Cross Hospital, testified that he treated Jonathan on October 21, 2017. Jonathan had lacerations to the face, left forearm, and left upper back, as well as abrasions to the right hand and head. Jonathan's facial stab wound required two sutures, and his back injury required four sutures. The wound to Jonathan's left forearm was a larger laceration categorized as a "complex laceration repair" due to its depth and size. Jonathan received a total of 33 sutures in the left forearm.

¶ 24 Dr. Kirsten Howell, an assistant medical examiner, testified that she performed Kennedy's autopsy on October 22, 2017. Kennedy had a stab wound on her chest, an incise wound on her right arm, and an injury to her aorta. The cause of death was homicide due to multiple sharp force

injuries. Dr. Howell identified photographs depicting Kennedy and her injuries at the time of the autopsy, including a two-centimeter incision in Kennedy's heart at the aorta, which would have caused blood to fill her chest cavity and place pressure on her lungs, preventing them from expanding and contracting normally.

¶ 25    Chicago police officer Douglas Anderson testified that he and his partner responded to the scene and later arrested defendant at his home. They searched him and recovered a clean black pocketknife from his pocket, which Anderson identified in court. Anderson did not notice injuries on defendant's face and hands. Anderson identified photographs of defendant's hands taken when he was arrested, which were admitted into evidence.  Those photographs are included in the record and do not depict any visible injuries.

¶ 26    The parties entered a stipulation that Detective Kristy Battalini would testify that she interviewed Jabarri and Jaythan and memorialized the interview. Neither the notes, nor a subsequent report, contained a statement about defendant approaching the gathering with a beer bottle in his hands.

¶ 27    Defendant testified that he had been a Marine between 1986 and 1993 and was honorably discharged. As part of his training, defendant learned to fight with a bayonet, but not a pocketknife. On October 21, 2017, defendant had been at his cousin's house with James, talking and drinking. Defendant then drove James home, where he saw Jonathan, Kennedy, Jennifer, and Catledge. Defendant previously had a dispute with Jonathan Jr., who called Kennedy a name when defendant's son was born, but the two had resolved their differences. Defendant also testified that he was aware that Jonathan had prior "domestic situations" and "problems with violence."

¶ 28 Jonathan approached defendant and asked him "why the f*** [he was] threatening [him]." Defendant put his hand out to shake Jonathan's hand, and Jonathan "gripped [his] hand hard." Defendant testified that he said "f*** that," and informed Jonathan that he and Jonathan Jr. had already "squashed" their issues. Jonathan then grabbed defendant by his right bicep and hit defendant across the face, knocking off his glasses. At that point, Kennedy came between the men. Jonathan again swung at defendant. Defendant believed that he needed to defend himself, because Jonathan was taller, younger, "hot-headed," and put defendant in fear for his life. Defendant denied that he was threatening Jonathan, or that he had an issue with Jonathan.

¶ 29 Defendant testified that Jonathan began "coming at" defendant, and so defendant moved Kennedy out of the way, removed a knife from his "right hip," and swung at Jonathan. Defendant did not hit Jonathan, but he did not see where the knife went at the time because his attention was on Jonathan and he feared for his life. Jonathan then "c[a]me[ ] at" defendant again, so defendant hit him in his left forearm. Defendant saw Kennedy fall to the ground, and noticed that she was bleeding profusely. At that point, Jonathan ran and defendant pursued him. Jonathan threw a chair at defendant, and defendant turned around, walked away, got in his car and drove home. Defendant testified that he went into shock, panicked, and attempted to dial 911. Defendant drove home and attempted suicide, but did not go through with it because he was thinking of his children. He then changed clothes, intending to go to the hospital and police department, but police approached him on his way to his vehicle. Defendant denied that he stabbed Jonathan in the back, or that he saw Jonathan fall against a tree.

¶ 30 On cross-examination, defendant testified he was 5'8" and weighed 180 pounds. He acknowledged that, when Jonathan ran toward the house, defendant did not stay with Kennedy,

but rather, "chased" him. Defendant also admitted that he informed the police that he did not know why he did not walk away when Jonathan hit him.

¶ 31    On redirect examination, defendant testified the incident was not a calm situation, and that other people were attempting to break up the fight between him and Jonathan. Defendant did not walk away from the fight because Jonathan "[k]ept coming." On re-cross examination, defendant testified that Jonathan ran to the house when defendant stabbed him, and defendant ran after him.

¶ 32    In rebuttal, the parties entered a stipulation that Detective Battalini would testify that during her interview of defendant, he did not say that he moved Kennedy out of the way or that Jonathan had hit him across the face and knocked his glasses to the ground.

¶ 33    The court instructed the jury regarding the elements of first and second degree murder, as well as self-defense.

¶ 34    The jury found defendant guilty of first degree murder and aggravated battery. Defendant filed a motion for a new trial, arguing in part that the jury erred in finding him guilty of first degree rather than second degree murder because the evidence showed he feared Jonathan and believed he was acting in self-defense. The court denied the motion and imposed 20 years' imprisonment for first degree murder and 30 months' probation to be terminated *instanter* on the aggravated battery charge. The court denied defendant's motion to reconsider the sentence.

¶ 35    On appeal, defendant argues we should reduce his first degree murder conviction to second degree murder because no reasonable jury could conclude that he was the aggressor in the fight with Jonathan and that he did not subjectively fear great bodily harm from him.

¶ 36    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (citing *People v. Cooper*, 194 Ill. 2d 419, 431 (2000)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 37     To sustain defendant's conviction for first-degree murder as charged, the State had to prove beyond a reasonable doubt that he intentionally killed Kennedy or knew that his actions would cause her death. See 720 ILCS 5/9-1(a)(1) (West 2016). Second degree murder is a lesser mitigated offense of first degree murder, with the same elements and required mental state. *People v. Staake*, 2017 IL 121755, ¶ 40. First degree murder may be mitigated to second degree murder where there is sufficient evidence that a defendant believed he was acting in self-defense, but that belief was objectively unreasonable. See *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995); 720 ILCS 5/9-2(a)(2) (West 2016). The defendant must also show by a preponderance of the evidence that imminent, unlawful force was threatened against him and he was not the aggressor. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 38     The State has the burden to prove the elements of first degree murder beyond a reasonable doubt, but a defendant bears the burden to prove, by a preponderance of the evidence, the presence

of a mitigating factor to reduce the offense to second degree murder. *Jeffries*, 164 Ill. 2d at 114. "The determination of whether a defendant is guilty of first degree murder or guilty of second degree murder or was justified because acting in self-defense is a question for the finder of fact." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 52.

¶ 39 The doctrine of transferred intent "holds that one who intends to kill another and kills an unintended victim is not absolved from answer to crime of murder." *People v. Hill*, 315 Ill. App. 3d 1005, 1012 (2000). Therefore, if a defendant intended to kill an individual, the law deems him to have intended to kill the innocent bystander. *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 59. This principle also applies to a defendant's specific intent to kill a person in self-defense. *People v. Getter*, 2015 IL App (1st) 121307, ¶ 36. Accordingly, "if the defendant acted in provocation or unreasonable self-defense in [killing] the intended target, he acted the same way with respect to the innocent bystander." *O'Neal*, 2016 IL App (1st) 132284, ¶ 59.

¶ 40 The State presented evidence that defendant attacked Jonathan first, who swung back in self-defense. Defendant then attacked and chased Jonathan with a knife, stabbing him in the arm, face, and back. Kennedy was between the men and defendant stabbed her in the chest during the fight. Defendant presented evidence that Jonathan was hostile to him and attacked him first with a punch to the face, and asserted that he used a knife in self-defense because he feared Jonathan.

¶ 41 Viewing the evidence in a light most favorable to the State, a rational trier of fact could find the State proved defendant committed first degree murder under the theory of transferred intent and that defendant failed to prove that he acted with a subjective belief that he was justified to stab Jonathan in self-defense. The jury heard evidence from defendant that Jonathan attacked him and he feared for his life because he was older than Jonathan, who had a history of domestic

violence. Nevertheless, the jury was not required to believe defendant's version of events. See *People v. Garcia*, 407 Ill. App. 3d 195, 203-04 (2011) (quoting *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018-19 (1993)) ("Whether a killing is justified under the law of self-defense is a question of fact [citations], and the fact finder is not required to accept as true the defendant's evidence in support of that defense [citations.]"). The jury reviewed a multitude of evidence from which it could find defendant did not prove he acted with a subjective belief in self-defense when he stabbed Jonathan. Members of the Williams family testified that defendant was the initial aggressor. The State also presented evidence that defendant pursued Jonathan, stabbed him in the face and back, fled the scene, and told police he did not know why he did not retreat during the incident.

¶ 42    Nevertheless, defendant asserts that none of the eyewitnesses' accounts were credible, as they attributed a "nonsensical" motive to him, namely that he was upset regarding a dispute which had already been resolved. Further, defendant argues the members of the Williams family falsified their account of the start of the fight in order to protect Jonathan, who would have faced criminal liability for attacking defendant and the felony murder of Kennedy. Defendant also argues that Jonathan's account was suspicious and contrary to human experience. Defendant's contentions amount to a request for this court to reweigh the evidence, resolve conflicts in the testimony, and determine the credibility of the witnesses. We will not substitute our judgment for that of the trial court regarding its assessment of the credibility of the witnesses and the inconsistencies in their testimonies. See *Brown*, 2013 IL 114196, ¶ 48. We find that a rational trier of fact could conclude that defendant did not establish that Jonathan's testimony was contrary to human experience, but rather, comported with an ongoing familial dispute which became violent.

¶ 43    Taking the evidence in a light most favorable to the State, we find a rational trier of fact could have found defendant did not establish that he was acting under an unreasonable belief in self-defense when he stabbed Jonathan and Kennedy. Therefore, we will not reduce the conviction to second degree murder.

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.