2022 IL App (1st) 191217-U

THIRD DIVISION
June 15, 2022

No. 1-19-1217

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 16837 |
| | ) | |
| STEVEN POPPO, | ) | Honorable |
| | ) | Allen Murphy and Patrick Coughlin, |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to prove that defendant committed first-degree murder, and to rebut defendant's claim of self-defense.

¶ 2    Following a bench trial, defendant, Steven Poppo, was found guilty of first-degree murder and several other offenses arising out of the October 9, 2016, shooting death of the victim, Gerald Fortson. In this appeal, defendant contends that the evidence showed he was legally justified in shooting the victim to prevent the forcible felony of robbery, and accordingly, that the State failed

to prove his guilt of first-degree murder beyond a reasonable doubt. In the alternative, defendant contends that the court denied him his due process right to a fair trial by failing to "properly consider" his self-defense claim.

¶ 3     The record shows that defendant was charged with first degree murder, unlawful use of a weapon by a felon, possession of a controlled substance with intent to deliver and possession of a controlled substance. The following evidence was presented at defendant's bench trial.

¶ 4     Damonte Fernando testified that he and the victim were friends. On October 9, 2016, he and the victim were smoking marijuana at the home of another friend, Jamonte McCarter, in Sauk Village. Fernando and the victim wanted to buy more marijuana. Fernando and the victim's regular dealer was not available, so McCarter referred them to his dealer, identified as "Poppo." The victim called Poppo, who gave them an address where they could purchase marijuana. At approximately 7:21 p.m., Fernando drove the victim in Fernando's Ford Taurus sedan to the address, a home on Nichols Drive in Sauk village. Fernando and the victim planned to buy 3.5 grams of marijuana for a total of price of $40, with each contributing $20.

¶ 5     When they arrived at the address, Fernando remained in the car while the victim walked up to the house and knocked on the front door. Defendant opened the door and spoke to the victim. Fernando was able to see defendant, as the area was well lit by a light outside the home and a streetlight. Defendant then went back in the house, and the victim sat outside the front door for two or three minutes. The victim then walked back to the vehicle and re-entered the front passenger seat. The victim told Fernando that defendant was going to come back out with the marijuana. The car was facing north toward Torrance and was in drive because Fernando expected the transaction to be brief.

¶ 6     After approximately three minutes, defendant walked up to the driver's side where Fernando was sitting. Fernando had both hands out in front of him and was holding his phone in one hand. Fernando indicated to defendant to go around to the passenger side because the victim had the money. Fernando observed defendant to be light-skinned, and wearing glasses, black jogging pants and a black hoodie with the hood up. Defendant had his right hand in the top right side of his hoodie and his left hand in the left pocket of his pants. Defendant went around to the passenger side where the victim's window was down, and Fernando heard the victim ask to smell the marijuana. Defendant initially said no, but then agreed. Fernando saw defendant holding the top of a bag of marijuana in his left hand. The victim was holding money in his left hand, and the bottom of the bag with his right hand. The victim was trying to smell the marijuana, but defendant would not let go of the bag. Fernando heard the victim say something to defendant, and then the victim said something like "come on, we're gone." Fernando then saw defendant pull a silver gun from the right side of his hoodie. Fernando saw sparks flashing and heard the loud bang of a gun going off. The victim "jump[ed]" toward Fernando and began to cough up blood. Fernando testified that neither he nor the victim had any weapons with them and neither of them ever threatened defendant.

¶ 7     After the shooting, Fernando drove north on Nichols and turned onto Torrance Avenue. The victim was unable to speak, and Fernando took the victim out of the car and placed him on his back. A man driving by stopped and performed CPR on the victim. An ambulance and police officers arrived, and Fernando gave the officers the bag of marijuana that the victim and defendant had been holding. The victim was taken away in the ambulance and Fernando later learned that he had died.

¶ 8     On cross-examination, Fernando testified that neither he nor the victim knew defendant before that night. The victim came back to the car and sat with his seat reclined almost even with the back seat. When defendant initially approached the vehicle, Fernando was on his phone looking at social media. At the point when the victim was trying to smell the marijuana, Fernando started paying closer attention to the victim and defendant. Fernando testified that he and the victim intended to purchase 3.5 grams of marijuana with $40, and denied that they were trying to buy 7 grams of marijuana worth $80. Fernando acknowledged that he was not at the door with the victim, and he did not hear the victim ask defendant for 3.5 grams. Fernando denied that he and the victim intended to rob defendant or for the victim to snatch the bag of marijuana. Initially, after Fernando pulled away, he was unaware that the bag of marijuana was in the car. Fernando testified that he did not see any "struggle" over the bag. The victim was "just trying to sniff the weed, and [defendant] wouldn't let it go."

¶ 9     Lawrence Paraday testified that he was driving on Torrance Avenue near 221st Street in Sauk Village when he saw a man near a Ford Taurus parked in the middle of the street asking for help. Paraday and his passenger, Roberto, walked over to the car and saw a black man pulling a young, bloody, incoherent black man who had been shot out of the passenger seat. While Roberto was on the phone with 911, the man said his friend was shot in the back. Roberto applied pressure to the bullet hole, then attempted to check for a pulse. Roberto could not find a pulse and began to perform CPR. The police arrived, then an ambulance arrived, and the young man was placed on a stretcher and taken away.

¶ 10    Ryan Hilt testified that as of October 2016, he had been buying marijuana from defendant, whom he identified in court, for almost a year. On the evening of October 9, 2016, Hilt texted defendant, defendant responded, and Hilt drove to defendant's residence on Nichols Lane in Sauk

4

Village. When he arrived at defendant's residence, Hilt noticed a dark colored Ford four-door sedan parked in front of defendant's residence. Hilt approached it "head on," and noticed that its headlights and taillights were illuminated. He pulled around the sedan, parked in front of defendant's house behind that vehicle, facing the opposite direction, and turned the car lights off. Hilt texted defendant that he was outside his home, as he usually did when purchasing marijuana from him. Hilt received a response from defendant, then sat with his head down looking at his phone. Hilt then heard one loud bang go off behind him, looked in his rear-view mirror, and saw the sedan speeding off toward 223rd Avenue at a high rate of speed. He did not see anyone outside and did not see what caused the loud bang. Hilt panicked and drove south. Less than ten minutes later, Hilt called defendant. Defendant answered, and Hilt asked him if he was okay and what happened. Defendant replied that he could not speak and hung up on him. Hilt never spoke with defendant again. Hilt further testified that shortly after the incident, he told Sauk Village Police that defendant told him that he was okay but could not talk to him at that time.

¶ 11    Keith Simmons testified that he met defendant approximately five years prior to 2016. They were close like brothers, and Simmons moved into the home defendant and defendant's father shared on Nichols Drive in Sauk Village. As of October 2016, Simmons lived in the rear of the top floor, defendant's father lived in the front of that floor, and defendant lived on the lower floor.

¶ 12    At approximately 7 p.m. on October 9, 2016, Simmons was at the residence with defendant and his father, eating, smoking marijuana and drinking alcohol. Simmons testified that he had not consumed so much that he was unable to be aware of his surroundings. Simmons observed "bings" on defendant's cell phone indicating incoming text messages. After receiving each text, defendant would go outside momentarily, and then come back inside. He observed defendant bring sealed

marijuana outside with him and was aware that defendant was selling it. Simmons testified that he, too, occasionally sold marijuana from the home. While defendant was outside, Simmons heard a single gunshot but could not tell what direction the gunshot came from. Simmons opened the front door where he encountered defendant, who appeared flustered, and they both went back inside. Once inside, Simmons asked defendant what happened, and defendant did not respond. Defendant then took his hands out of the zippered front pocket of his hoodie and Simmons saw that defendant had his .38-caliber chrome revolver with a wooden handle in one of his hands. Defendant put the revolver on his bed, received some texts, wiped the revolver down, took bullets or empty shells out of the revolver and put them in his pocket, then put the revolver in a dresser drawer. Simmons testified that he and defendant regularly wiped their guns down. As the night went on, Simmons observed defendant become quieter and "shutdown."

¶ 13    At some point, the police came to the front door and spoke with defendant's father, but Simmons did not know what was said. Simmons repeatedly asked defendant what happened outside and received no answer. Simmons then saw on social media that a shooting had occurred on their street and that the victim had died. Simmons informed defendant, who responded that he "shot the n***," and he thought that the men had tried to rob him before. Simmons asked defendant why he shot him, and defendant responded that the victim "tried to snatch a seven out of his hand." Simmons understood "a seven" to refer to seven grams of marijuana or a seventh of an ounce, with a street value of $70. Simmons replied that defendant should have "let him." Simmons further testified that he was with defendant when Hilt called. Simmons heard only defendant's part of the conversation, and heard defendant say that he was "good." Simmons later went to sleep and testified that he did not call the police because he did not think he had any reason to do so. At

approximately 2 a.m., while a SWAT team was outside the home, Simmons jumped from the second floor, "shatter[ing] [his] footplate," and was arrested.

¶ 14    After receiving medical treatment, Simmons was taken to the Sauk Village Police Department where he spoke with Detective Werniak and Sergeant Grab. The following day, he was interviewed by an Assistant State's Attorney (ASA) and testified under oath before the Grand Jury. Simmons acknowledged during his testimony that he did not tell anyone prior to his trial, including the police, the ASA, or the Grand Jury, that defendant said that he thought the men had tried to rob him before, explaining that it was his trial testimony that counted. Simmons also acknowledged that in 2006, he was convicted of Class X felony home invasion and sentenced to nine years' imprisonment.

¶ 15    On cross-examination, Simmons testified that defendant had his gun with him each time he sold marijuana. Simmons was aware that defendant had been robbed three or four times, including in July, a few months prior to the shooting. After Simmons heard a gunshot and met defendant at the door, he told defendant they should leave the home, but defendant would not. They stayed together on the lower floor until Simmons went upstairs to sleep. After defendant declined to leave, Simmons did not see defendant bleach his hands or change, wash, or dispose of his clothes. After defendant wiped down the gun, he put more bullets into the gun, and put the gun in the dresser, but defendant did not do anything to get rid of the gun.

¶ 16    Sauk Village Police Sergeant Jack Evans testified that at approximately 7:11 p.m. on the night of the shooting, he responded to a report of a person shot. Sergeant Evans went to the 2200 block of Torrance Avenue where he observed a vehicle parked in the middle of the road. A young black male who appeared to have suffered a gunshot wound was lying next to it. Sergeant Evans

7

observed blood on the victim and inside the vehicle. After multiple people attempted CPR, an ambulance arrived and transported the victim to the hospital.

¶ 17    The State presented testimony of several officers, and stipulated testimony of another, regarding the investigation, surveillance, and search of defendant's home. In general, their testimony established that in the early morning hours of October 10, 2016, a multi-jurisdiction SWAT team surrounded the residence. After the team attempted to make contact with the residents, defendant's father came out of the front, Simmons jumped out of the back, and defendant came out almost an hour later. After the SWAT team deemed it safe, other officers executed a search warrant. During that search officers recovered a black zippered hoodie with a White Sox emblem and a pair of black sweatpants draped over a clothesline. Those items appeared to be thrown over the clothesline, while other items of clothing were hung neatly or on hangers. They also recovered a wallet containing defendant's identification card, and three safes containing, among other things, several firearms, ammunition, suspect marijuana, and suspect mushrooms. Officers also executed a search warrant for defendant's fingerprints and palmprints, and a buccal swab standard. Meanwhile, at the location of the vehicle on Torrance Avenue, officers recovered $31 of bloodstained United States currency, and a sandwich bag containing a green leafy substance.

¶ 18    Sauk Village Police Detective Sergeant Grossman testified that on the evening of October 9, 2016, he was assigned to investigate the victim's shooting. Sergeant Grossman initially responded to the scene of the stopped sedan on Torrance Avenue, where he spoke with other officers. He then went to the Sauk Village police station where he spoke with Fernando. Fernando told Detective Sergeant Grossman that the shooting occurred on the 22500 block of Nichols. Detective Sergeant Grossman took Fernando to that area, and asked Fernando to identify the home from which the offender had emerged. Fernando identified 22520 Nichols as the residence.

Detective Sergeant Grossman then returned to the police station, and obtained a search warrant for that residence. Detective Sergeant Grossman was present at 2 a.m. when the search warrant was executed. Detective Sergeant Grossman learned that someone was arrested.

¶ 19 Detective Sergeant Grossman returned to the police station, where he and Detective Jehiel interviewed defendant, whom he identified in open court. After being advised of his *Miranda* rights, defendant spoke with them without an attorney present. The interview of defendant was electronically recorded, and clips of that interview were published and admitted into evidence. Defendant told them that the victim "grabbed the weed and I bust [*sic*] and I shot him with my .38." He stated that he shot the victim because he "didn't want to get robbed" and he "busted the gun to scare him." In response to the question of how he knew that he was being robbed, defendant stated, "You don't come to a drug dealer's house and like 'oh you got a seven on you?' You just, you just don't do it."

¶ 20 Detective Sergeant Grossman testified that he showed defendant a photo of the victim. Defendant identified him as the man he shot, and wrote, "This is the guy" on the photograph. Defendant was unable to identify a photo of the driver. Detective Sergeant Grossman also showed defendant a photo that defendant identified as the .38 snub nose gun that he used to shoot the victim, two photos that defendant identified as photos of two other firearms recovered from his residence, and a photo that defendant identified as the cellphone recovered from his home.

¶ 21 On cross-examination, Detective Sergeant Grossman testified that defendant said that he did not know the man who came to his door to buy marijuana. During the interview, defendant said that when the victim came to his door to purchase marijuana, he felt that something was not right. Defendant also told him where they could find the sweatshirt and jogger pants that he had been wearing. Defendant told them that there was a revolver in a safe and provided them with the

code to open it, so he relayed that to his team who opened the safe. Defendant provided the code to a second safe and told them that a key was hidden in a slit in the couch and Detective Sergeant Grossman passed that information on to the team as well. During the interview, defendant stated that he intentionally fired his gun to scare the men in the car, and that he did not know if he had struck anybody. Defendant also told Detective Sergeant Grossman that he learned from a Facebook post that one of the men had likely died. Detective Sergeant Grossman recalled that he told defendant that the detective did not know if the man defendant shot and the driver were trying to "jack" him or not, and defendant responded, "Sounds like you already know." He further recalled that defendant said that he intentionally fired the gun, but that he was only intending to scare the victim.

¶ 22    The parties stipulated that Zhou Wang, M.D., would testify as an expert in forensic pathology. Dr Wang would testify that on October 10, 2016, he performed a post mortem exam on the victim's body. He observed a gunshot entrance wound on the victim's right mid back, and recovered an intact copper jacketed bullet from his central upper chest. Dr. Wang would testify that the cause of the victim's death was a gunshot wound to the back, and the manner of death was homicide.

¶ 23    The parties further stipulated that Mary Wong was employed at the Illinois State Police Forensic Science Center and qualified to testify as an expert in the forensic science of trace chemistry. After analyzing a gunshot residue kit administered to defendant, Wong concluded that defendant had discharged a firearm, contacted a primer gunshot residue related item, or had both hands in the environment of a discharged firearm. She also analyzed a gunshot residue collection kit administered to defendant's "jacket" and in her expert opinion the results indicated that the

sample areas contained a primer gunshot residue related item or were in the environment of a discharged firearm.

¶ 24    The parties stipulated that Nicole Fundell would testify that she was a forensic scientist employed by the Illinois State Police Crime Lab qualified as an expert in the area of firearms examination and as part of her duties she examined a Charter Arms Corporation .38 Special revolver, as well as one fired projectile, and that the firearm was in firing condition and that the fired projectile was fired from that firearm.

¶ 25    Additionally, the parties stipulated that Pamela Wilson would testify that she was a forensic chemist at Illinois State Police Crime Lab qualified to testify as an expert in the area of forensic chemistry, that she conducted commonly accepted tests and found that three recovered packages of green leafy substance tested positive for the presence of cannabis. The bag recovered from the sedan had a total weight of 6.8 grams, while two packages recovered from defendant's residence had a total weight of 426.1 grams, and 77.8 grams. Another container of mushrooms tested positive for the presence of Psilocyn weighing a total of 4.5 grams.

¶ 26    Finally, the parties stipulated that Holly Heitzman, a forensic scientist employed by the Illinois State Police Crime Laboratory, would testify as an expert in the area of fingerprint analysis and comparison. Heitzman would testify that she conducted a partial examination of the clear plastic sandwich bag found at the sedan, and a sealed envelope containing one set of inked fingerprints and palm print standard for defendant. Heitzman discovered at least one latent print on the sandwich baggie that was suitable for comparison, and it was her expert opinion that the latent fingerprint was made by the right thumb of defendant.

¶ 27    The State entered a certified statement of conviction for defendant for the offense of aiding escape of a felon from an institution, entered on February 10, 2006, and rested.

¶ 28    The defense then made a motion for a directed finding. Regarding one count, possession of a controlled substance (Psilocyn) with intent to deliver, the court concluded that the State failed to prove defendant's intent to deliver with regard to that charge. The court granted the defense motion as to that count and denied it as to the remaining offenses.

¶ 29    Defendant then testified that on October 9, 2016, he lived at 22520 Nichols Avenue in Sauk Village, a two-story home in a residential neighborhood on a block that was very poorly lit by a few streetlights. Defendant lived with there with his father and Simmons. Defendant testified that as of October 2016, he sold drugs out of the home, and had been doing so for approximately one year. Defendant testified that Simmons also sold drugs and sometimes they shared customers. Defendant acknowledged that he had a 2006 felony conviction of aiding and abetting a felon.

¶ 30    Defendant testified that in June or July of 2016, he was the victim of a home invasion committed by his customers. The State objected to defendant's testimony, arguing that the actions of people other than the victim could not justify the use of force against the victim. The court overruled the objection, stating that it anticipated that defendant might argue that he committed second degree murder, and defense counsel responded that was "correct." The court allowed the testimony for that purpose. Defendant then continued his testimony, recounting that his customers had entered his home, held him at gunpoint, pistol-whipped him in the head, punched him, kicked him, and took his "drugs money."

¶ 31    Defendant further testified that at approximately 7 p.m. on October 9, 2016, he was at his home with his father and Simmons. Defendant was wearing black jogging pants and a black zip-up hoodie with a White Sox logo and zippered pockets on each side. Someone knocked on the door, and defendant answered. Defendant saw a young black male whom he did not know. Defendant identified a photograph of the victim in court and testified that the victim asked

defendant if he had "a seven," which defendant understood to mean seven grams of marijuana. Defendant responded that he would have to get it from inside the home, asked the victim to wait, and closed the door. After retrieving the marijuana, defendant returned to the door and opened it, but no one was there. Defendant began to feel "suspicious." He looked outside and saw a gold car in the street near the curb, close to his driveway and "on the wrong side of the street," facing north. He observed that the brake lights were on, which made him "even more suspicious." Standing at the doorway, defendant could not see inside the car.

¶ 32    Defendant testified that he approached the driver's side of the vehicle, and he could "sort of" see into the car. He saw the window was down except for three inches, and the driver, who he identified as Fernando, was holding a cell phone with the screen illuminated. The gear shift was in drive, which made him "afraid." Fernando told defendant to go to the passenger side because the passenger had the money. As defendant walked to the passenger side, he could not initially see the victim's entire body. Once at the passenger side window, defendant noticed that the victim's seat was completely reclined so that it was even with the back seat. Defendant testified that the victim began to move from lying all the way back in the reclined seat as he asked defendant to smell the marijuana. The victim told defendant that he was "not going to buy the s*** if [he] can't smell it." Defendant held one end of the plastic bag of marijuana in his hand, while the victim leaned forward to smell it. Defendant then testified that the victim "snatche[d] the bag" and "in one fluid motion *** reache[d] to the floor," leaning his body forward. Defendant felt "[v]ery scared" that the victim "was going to pull a gun and shoot" him, so defendant pulled out his chrome "five-shooter" .38 revolver from his pocket and shot "[i]n the car" once. Defendant identified photos of the floor of the vehicle showing "something" on the passenger-side floor. When asked

13

if that was what he saw that night, he testified that "[i]t could have been that, but I thought he was reaching for a gun."

¶ 33    While defendant was shooting, the car moved forward "slow" without stopping. He observed that another customer, Hilt, had been waiting for him, but Hilt drove away in the opposite direction of the gold car. Defendant went inside his house where his father and Simmons were, went downstairs, and sat in his room. He did not run, hide, throw away or bury the gun, bleach his hands, or wash his clothes. Several hours later, defendant heard a knock at the door and his father answered it outside of defendant's presence. Defendant thought it might have been a police officer at the door because he saw red and blue lights and saw the police leave. The police did not come into the house to speak to either him or Simmons. Simmons later saw on Facebook that someone had been shot on defendant's block and he informed defendant. Defendant did not wash up, wash his clothes, get rid of the gun or leave the house. Defendant identified photos of the clothes that he was wearing hanging on a clothesline along with other clothing on hangers. Defendant testified that he had taken those clothes off after the shooting when he put on sleeping clothes and placed them on the clothesline without washing them, as was his normal habit at the end of the day. He also put his silver revolver and some marijuana in his safe, as he normally did at the end of the night. Defendant explained that he did that because he and Simmons both sold drugs and he did not want their items to become "mixed up." Defendant testified that at approximately 2 a.m., while he, his father and Simmons were each in their respective bedrooms, the police came over the radio and told everyone to come out of the house. Defendant put on his shoes and within a couple of minutes, he went to the door. Defendant saw the police take his father into custody and was told that Simmons jumped out of the upstairs bathroom.

¶ 34    Defendant was transported to the Sauk Village Police Department where he was twice interviewed by Detectives Grossman and Jehiel. Defendant testified that he initially denied knowledge of the shooting because he "didn't know what happened," and he was waiting for the police to tell him what happened. Neither detective indicated to defendant that they had any information about what happened or that someone had died. At some point, Detective Grossman told defendant that the detective did not know if "the guy was trying to jack [defendant] or not," and defendant believed that meant that the detective knew "what happened." Defendant understood "jacked" to mean that "they are trying to rob you with a gun." Detective Jehiel also made a comment that the men "tried to rip you," which defendant understood to have the same meaning. Defendant testified that at some point during the interview, one of the detectives told him that the victim had died, and that made him feel "bad," "nervous," and "shocked." Defendant told the detectives something to the effect of "they tried to get down on me," meaning that the men in the car were trying to rob him "aggressively" and "with a gun." Defendant recalled that when Detective Jehiel asked him why he fired his gun, he responded that the victim was robbing him. Defendant denied that he was trying to shoot the victim or to strike anyone when he fired his gun, explaining that he was trying to scare the victim and Fernando "to prevent them from grabbing their weapon to use on me." Defendant told the detectives where they could find his clothes, provided them with the combinations to, and the location of a key for, the safes in the home. Defendant further testified that when the victim knocked on his door, there had been no prior communication by text message or a phone call between them.

¶ 35    Defendant acknowledged that his trial testimony was different from what he told the detectives during his interview. Defendant did not tell the detectives that the car was running, that it was parked facing the wrong direction, that the driver's side window was down, or that the gear

15

shift was in drive. Defendant also did not tell the detectives that Fernando's foot was on the brake, that the victim's passenger seat was fully reclined, or that the victim leaned forward and reached toward the floor. Finally, defendant did not tell the detectives that there was an object on the passenger-side floor that he thought was a gun, that he thought the victim was reaching for that gun, or that he believed the victim was going to shoot him.

¶ 36    On cross-examination, defendant testified that despite his suspicions, he did not turn away the victim because he wanted his money. Defendant testified that he never saw the victim with a weapon, and the victim did not threaten defendant. Defendant did not ask the victim to show him the money or tell him where to wait before defendant retrieved the marijuana. Defendant agreed that he could have gone back inside his house and stayed there, or asked Simmons to accompany him to the car, but he did not do so. Defendant testified that instead, he came back to the door with the gun in one pocket and the marijuana in the other pocket. He agreed that he brought a loaded gun and that "you don't bring a gun somewhere unless you plan to use it." After seeing the brake light, noticing that there were two people in the car and becoming uncomfortable, defendant did not walk away, get Simmons, or ask the men to step out of the car. He felt comfortable enough to continue with the transaction.

¶ 37    Defendant testified that, while at the passenger's side door, defendant had the bag of marijuana in his left hand and his loaded gun in his pocket with his right hand on it. When asked about the victim requesting to smell the marijuana, defendant acknowledged that this was not unusual, and that it was common for customers to want to inspect the product before purchasing it. The victim had to sit up to smell the marijuana because his seat was reclined, and defendant was not going to hand it over to him. As the victim moved the bag of marijuana closer to him and away from defendant in order to smell it, defendant thought the victim was going to take the bag without

paying for it. Defendant lost control of the bag of marijuana, and defendant did not see where the bag went. Defendant testified that there was no "struggle" between him and the victim, and that the victim did not hold onto defendant's person. Defendant then reached inside his pocket for his gun, pointed it at the victim while his back was to him, aimed, fired, and shot the victim in the back. He acknowledged that neither Fernando nor the victim threatened him, and that he never saw a gun. Defendant further testified that he previously said that he shot because he wanted to scare them. Defendant acknowledged that he could have only pointed the gun, or shot into the sky or at the ground, if he wanted to scare them.

¶ 38    As the car drove slowly away from defendant, defendant walked back to the house. When defendant arrived back at the front door, Simmons was there and asked him what happened. Defendant told Simmons he fired a shot. Defendant did not call 911. He agreed that he did not know what the neighbors may have seen, and that he had to get rid of some of the evidence. Defendant took off his clothes, and took out the shell that was from the bullet he shot into the victim and threw it into the trash because he did not want the police to find it.

¶ 39    When the police arrived and knocked on his door, defendant did not tell them what happened. After the police arrived and later the SWAT team, he knew that the victim was dead and that he would be taken into custody for the shooting. Defendant flushed the shell casing down the toilet before he was taken to the police station so the police could never find it. Defendant agreed that when the police asked defendant about the shell casing, he could have told them that he shot the victim after he tried to rob him with a gun, but he did not. Instead, he lied and said he did not know anything about the shooting, because he thought it would help him get out of trouble. Defendant only started to tell the police some of the truth after they told him about some of their investigation. The police asked defendant if Simmons knew anything, and defendant lied and told

them that he did not, and that Simmons was not even there. Defendant elaborated, asking detectives why he would ever say anything to Simmons, because it would have been incriminating himself. Defendant also acknowledged that before he went outside to the police, he blocked many of his customers contacts on his cellphone because he knew the police would take his phone, and he did not want customers contacting him while he was at the police station because it "wouldn't look good" to the investigating officers.

¶ 40    Defendant acknowledged that the home invasion did not involve the victim or Fernando and that neither of them ever had a firearm or attacked him with a firearm. While he was being interviewed, defendant did not tell anyone about the home invasion, or that he was afraid or defending himself. Defendant further acknowledged that it was not until trial, more than two years later, that he first contended that he was afraid for his safety. Instead, during the interview, defendant told officers that he was trying to scare the victim and Fernando because they were trying to rob him. Defendant agreed that it was "not just about losing money," but also about "losing respect" because if others found out that he let people steal from him, it would make him "look weak."

¶ 41    On re-direct examination, defendant testified that when he brought the gun to the car, he did not intend to shoot anyone. Defendant did not see a gun but believed that was what the victim was reaching for, and defendant's reaction to fire was "immediate." Defendant further testified that while he deleted some customer contacts from his phone, he did not delete any calls or texts. At the conclusion of defendant's testimony, the defense rested.

¶ 42    In closing, the State argued that defendant knowingly and intentionally shot and killed the victim, that defendant brought a gun to a drug deal, and that the victim and Fernando did not have a weapon: "It was no struggle. There was no fight. What there was, was a defendant who was

trigger happy, and ended [the victim]'s life over a small amount of cannabis." The State further argued that defendant's actions following the shooting, particularly flushing the shell casing down the toilet, demonstrated defendant's consciousness of guilt. "These are not the actions of a person acting justifiable self-defense. Those are the actions of a person trying to cover their tracks."

¶ 43    The defense argued that defendant was "justified in his belief that his life was in danger and that he could possibly be shot" and that his beliefs were "reasonable given the nature of this transaction," defendant's "overall lifestyle," his "previous victimization," and "the behavior of the people in the car." The defense argued that the victim was reaching down, and that it was reasonable under the circumstances for defendant to believe that the victim was reaching for a gun.

¶ 44    The court pronounced defendant guilty on all counts. The court explained:

> "Here's how I see the facts in this case. Damonte Fernando and the decedent victim here Gerald Fortson went to Steven Poppo's house in Sauk Village, Illinois. And I don't think there is any doubt about it when you take a look at the case realistically that they went there with the intent to steal weed from him. According to [Fernando], they only had $40 amongst them. But they went to buy $70 worth. How do we know that? By what was recovered inside of the car which was *** 6.8 grams of cannabis close to 7 grams. The Defendant said that the guy was looking to buy a seven, which is seven grams. So that's $70 worth. They didn't have enough money to buy the weed. So when [the victim] is smelling the weed *** that was a ruse to gain control of the bag. Because we heard [Fernando] testify at some point [the victim] said come on; we gone. That was a signal to [Fernando] that I have secured possession of the weed. Let's get out of here. And that's what [Fernando] did. He sped off. And when he sped off, the Defendant shot [the victim] in the back. And

19

this was a[n] unprovoked attack. It was not a forcible felon[y], which occurred. The statute that's in play here is use of force in defense of person, 720 I.L.C.S., 7-1. A person is justified in the use of force against another when and to the extent that he reasonabl[y] believes that such conduct is necessary to defend himself or another against such imminent use of force or unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonabl[y] believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the commission of a forcible felony. Merely getting possession of a bag of marijuana is not a forcible felony. Also [the victim] posed no imminent threat of great bodily harm or death to the Defendant in this case.

* * *

What happened here was the Defendant was upset that somebody was getting away with his work, and he shot the gun. Simpl[e] as that."

¶ 45    The court found that defendant's actions were intentional, and not reckless, noting specifically the location of the victim's injury in his back next to his spinal column. The court stated, "[t]his was not I was just trying to scare him. This was I was trying to shoot him, and I hit my target." The court also explained that defendant's actions following the shooting negated the defense's claim. He noted Simmons's testimony that defendant wiped down the handgun, and defendant's acknowledgment that he changed his clothes and disposed of the shell casing by flushing it down a toilet.

¶ 46    The court found defendant to be "not convincing" and "not a very credible witness." It noted that the "most damaging evidence in this case" was defendant's statement to Detectives Grossman and Jehiel. The court observed that defendant had

> "every opportunity in the world to talk about how [the victim] may have been reaching down for a gun underneath the seat. How I got home invaded several months ago, and I am afraid that these guys were going to get the gun that I had on me, and shoot me. And all we had from the defendant was silence. The only time he talked he was lamenting maybe he will be eating soybean burgers in the Illinois Department of Corrections."

The court also pointed out that when defendant was shown a picture of the victim and "asked *** an open-ended question" about whether he knew who he was, defendant responded that it "looks like the guy that I shot," and wrote, "This is the guy" on the photograph. The court elaborated:

> "He could have put down that's the guy who was reaching down, looking to get a gun. That's the guy who was going to try to rob me. He could have put down any of that. The only thing he put down [was] this is the guy. It was an open-ended invitation by Grossman. *** Nothing prevent[ed] him from saying this is the guy that tried to rob me."

¶ 47    The court concluded:

> "So I find that the State has proven the defendant guilty of first degree murder beyond a reasonable doubt. But it doesn't end the inquiry there because now we have to determine whether the defense has proved by a preponderance of the evidence the mitigating factor that at the time of the offense—at the time of the offense, not two years, four months later—that he had an actual subjective belief

21

[in] the need for self-defense but his belief was unreasonable. And he bases this belief on a claim that he was home invaded and pistol whipped and robbed at gun point during a home invasion several months ago. And that's why he claims he had an actual subjective belief [in] the need for defense. I don't buy that at all. That's concocted.

That's been concocted over the pendency of this case. If [he] had that belief, he should have talked about it back in October of 2016. He shouldn't have waited until January of 2019 to make that claim. That claim rings very, very hollow in this court's mind. And I believe that he had absolutely no subjective belief [in] the need for self-defense.

This was indeed a murder case over 7 grams of weed. It's really hard to get your head around. But it's a finding of guilty, all counts."

¶ 48    The trial court found defendant guilty of first-degree murder, rejecting his claim of self defense and finding that he personally discharged the firearm. The court also found defendant guilty of one count of possession of cannabis with intent to deliver, twelve counts of unlawful use of a weapon by a felon, and two counts of possession of a controlled substance. Defendant's motion to reconsider the finding of guilt, or, in the alternative, for a new trial was denied. The court sentenced defendant to 50 years' imprisonment for the first-degree murder count. Additionally, the court sentenced defendant to five years' imprisonment for possession of cannabis with intent to deliver, five years' imprisonment for unlawful use of a weapon by a felon, and three years' imprisonment for possession of a controlled substance, to be served concurrently with each other, but consecutively to the first-degree murder count. Defendant's motion for reconsideration of his sentence was denied. Defendant filed a timely notice of appeal.

¶ 49    In this court, defendant first contends that the State failed to prove his guilt beyond a reasonable doubt. He asserts that the evidence at trial failed to rebut his claim that his use of force was legally justified to prevent the commission of the forcible felony of robbery.

¶ 50    When a defendant challenges the sufficiency of the evidence, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. *Id.* A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). A reviewing court will not overturn a fact-finder's credibility determinations merely because the reviewing court would have decided the case differently. *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004). Specifically, "[w]hether a killing is justified under the law of self-defense is a question of fact [citations] and the fact finder is not required to accept as true the defendant's evidence in support of that defense." *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018-19 (1993). Instead, "the trier of fact is obliged to consider the probability or improbability of the evidence, the circumstances surrounding the event, and all of the witnesses' testimony." *Id.*

¶ 51    In order to prove that defendant committed first-degree murder, the prosecution was required to prove that he killed the victim without lawful justification and with the intent to kill or do great bodily harm, or knowing that his acts would result or likely result in the victim's death. 720 ILCS 5/9-1(a)(1) (West 2016). Self-defense is an affirmative defense to first degree murder

and, once raised, the State has the burden of proving beyond a reasonable doubt that the defendant's use of force was not legally justified. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 52    Section 7-1 of the Criminal Code provides that:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016).

¶ 53    As the plain language of the above indicates, deadly force may be used in two separate circumstances: where a person reasonably believes that such force is necessary (1) to prevent imminent death or great bodily harm to himself or another, or (2) to prevent the commission of a forcible felony.

¶ 54    At trial, defendant focused mainly on the first circumstance. As defense counsel argued in closing, the defense's position was that defendant was "justified in his belief that his life was in danger and that he could possibly be shot." The defense was based primarily on defendant's history of being a victim of a home invasion, his unease during the encounter with the victim, and his belief that the victim was reaching for a gun on the floor of the vehicle. In the alternative, the defense asked the court to find based on the same circumstances that defendant had a genuine but unreasonable belief in the need for self-defense, resulting in a lesser conviction of second-degree murder. The court rejected both claims, concluding that defendant had no such belief, reasonable or unreasonable. The court stated that it "d[id]n't buy that at all," and that the defense was

"concocted over the pendency of this case," specifically noting that defendant waited until trial to make the claim.

¶ 55    Now, defendant focuses on the second part of the statute, arguing that he shot the victim in self-defense in order to prevent the forcible felony of robbery. Defendant contends that when the victim snatched the bag of marijuana intending to take it without paying for it, the victim was committing the forcible felony of robbery, and defendant was justified in shooting him to prevent that robbery.

¶ 56    Robbery is a forcible felony. 720 ILCS 5/2-8 (West 2016). A person commits robbery when he knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-1(a) (West 2016). However, "a simple snatching or taking of property" from a person is not sufficient force to constitute a robbery. *People v. Merchant*, 361 Ill. App. 3d 69, 72 (2005). The difference " 'between private stealing from the person of another [larceny or theft] and robbery lies in the force or intimidation used.' " *People v. Pierce*, 226 Ill 2d 470, 478 (2007) (quoting *Hall v. People*, 171 Ill. 540, 542 (1898)). As our supreme court has explained, "the gist of the offense of robbery is the force or fear of violence directed at the victim in order to deprive him of his property." *People v. Dennis*, 181 Ill. 2d 87, 104 (1998). An act may constitute robbery where "a struggle ensues, the victim is injured in the taking, or the property is so attached to the victim's person or clothing as to create resistance to the taking." *People v. Hay*, 362 Ill. App. 3d 459, 466 (2005). "A taking from the person or presence is met when the property is in the possession or control of the victim and the robber uses violence or fear of violence as the means to take it." *Dennis*, 181 Ill. 2d at 101. "In the absence of facts to show that fear was reasonable, a mere subjective feeling of fear will not support a conviction for robbery." *Id.*, at 102.

¶ 57 Defendant argues in this appeal that the evidence reflects that the victim used sufficient force to constitute the forcible felony of robbery and that defendant was justified in using force to prevent the commission of the robbery. While defendant did not specifically make this claim at trial, the court indicated that it would have rejected a claim that defendant's use of deadly force was justified to prevent "the commission of a forcible felony." The court specifically noted that, while it agreed that Fernando and the victim intended to steal the marijuana, "[m]erely getting possession of a bag of marijuana is not a forcible felony." The court rejected defendant's claim that he was afraid, or that he was merely trying to "scare" the victim. Instead, the court believed that defendant shot the victim because defendant "was upset that somebody was getting away with his work."

¶ 58 When viewed in the light most favorable to the State, the record supports the court's conclusion that, while the victim and Fernando intended to dispossess defendant of the bag of marijuana, that dispossession did not rise to the level of a robbery. Fernando and the victim were unarmed, and did not threaten or cause injury to defendant. As defendant testified, he and the victim were both holding the bag of marijuana as the victim moved it closer to himself so that he could smell it. Defendant acknowledged that this was not unusual, and that it was common for customers to want to inspect the product before purchasing it. He further testified that when the victim snatched the bag, the victim was not holding onto his person. Both defendant and Fernando confirmed that there was no "struggle" over the bag. Defendant agreed that he simply lost control of the bag, and then shot at the victim as he fled. As the record supports the trial court's conclusion that the victim did not use force or the threat of force in taking the bag of marijuana from defendant, the court properly determined that the victim's actions did not amount to a robbery. See *People v. Patton*, 76 Ill. 2d 45, 47-48 (1979) (finding that the prosecution failed to establish the elements of

robbery where the defendant "swiftly grabbed" the victim's purse from her fingertips, causing her arm to be thrown back "a little bit," and the purse "was gone before [the victim] realized what had happened."); *Hall*, 171 Ill. at 542-43 ("where it appeared that the article was taken without any sensible or material violence to the person, as snatching a hat from the head or a cane or umbrella from the hand of the wearer, rather by sleight of hand and adroitness than by open violence, and without any struggle on his part, it is merely larceny from the person."); *People v. O'Connor*, 310 Ill. 403, 407 (1923) (reversing robbery convictions of defendants who grabbed a pocketbook from the hand of their victim). Viewing all the evidence in the light most favorable to the State, as we are required to do on appeal (*Hall*, 194 Ill. 2d at 330), we find that the State presented sufficient evidence to support defendant's first-degree murder conviction and to rebut defendant's claim of self-defense.

¶ 59    Defendant next contends that he was denied his due process right to a fair trial because the court made a "mistake of law" and "failed to properly analyze [his] justifiable use of force claim." Defendant contends that "the court disregarded [defendant]'s defense that he was robbed and mistakenly found that [the victim]'s taking was '[m]erely getting possession of a bag of marijuana.' "

¶ 60    As a threshold matter, the State contends that this issue is forfeited because defendant failed to object at trial and raise the matter in a written post-trial motion.

¶ 61    In general, to preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion. *People v. Cregan*, 2014 IL 113600, ¶ 15. A defendant, however " 'need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court.' " *People v. Williams*, 2013 IL App (1st) 111116, ¶ 108 (quoting *People v. Mitchell*, 152 Ill. 2d 274, 324 (1992)). Although defendant did not immediately object

during the trial court's findings, counsel argued in closing that the victim and Fernando were "there *** to rob" defendant." And, while defendant did not define the issue precisely in his post-trial motion, defendant asserted that he was "denied due process of the law." As our supreme court has explained, constitutional issues that were properly raised at trial and may be raised later in a postconviction petition are not subject to forfeiture for failing to include them in a posttrial motion. *Cregan*, 2014 IL 113600, ¶ 15; see also *Mitchell*, 152 Ill. 2d at 325 (1992) (despite the defendant's failure to raise an issue with specificity in his posttrial motion, the issue on appeal was not waived where it involved "the type of constitutional error which may be later raised in a post-conviction hearing."). In these circumstances, we would not find this issue forfeited.

¶ 62    Nevertheless, we note that defendant's argument on this issue is essentially a regurgitation of his reasonable doubt argument. Because we have previously concluded that the court properly considered, and rejected, defendant's self-defense claim, we also reject defendant's claim that the court's "misapprehen[sion] [of] the law den[ied] defendant a fair trial" on the merits. As explained above, it is clear that the trial court understood the applicable self-defense standard, and determined that the victim's actions did not rise to the level of a forcible felony that would have justified defendant's use of deadly force. Accordingly, the record does not reflect any mistake of law, let alone one that denied defendant a fair trial.

¶ 63    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.